RENATA GOWIE
Assistant United States Attorney
Chief, Civil Division
1000 SW Third Ave., Suite 600
Portland, OR 97204
Telephone (503) 727-1000

BRIAN M. BOYNTON
Acting Assistant Attorney General
R. MICHAEL UNDERHILL
Attorney in Charge, West Coast Office
Torts Branch, Civil Division
ERIC KAUFMAN-COHEN
Assistant Attorney in Charge
Torts Branch, Civil Division
U.S. Department of Justice
P.O. Box 36028
450 Golden Gate Avenue, Room 7-5395
San Francisco, California 94102-3463
Telephone: (415) 436-6647
Facsimile: (415) 436-6632
E-mail: eric.kaufman-cohen@usdoj.gov

Attorneys for Defendant
United States of America

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| STEVEN M. NELSON,<br><br>        Plaintiff,<br><br>  vs.<br><br>UNITED STATES OF AMERICA, by and through the NATIONAL OCEANIC and ATMOSPHERIC ADMINISTRATION,<br><br>        Defendant | Case No.: 3:19-cv-01761-HZ<br><br>IN ADMIRALTY<br><br>THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION<br>[Oral Argument Requested]<br><br>Date:  May 10, 2021<br>Time:  3:00 p.m.<br>Courtroom 15A<br>HON. MARCO A. HERNANDEZ |

## **TABLE OF CONTENTS**

LR-7 CERTIFICATION …………………………...……………………………… 1

MOTION …………………………………………………...……………………  1

RELIEF SOUGHT …………………………………………………………….... 1

MEMORANDUM OF POINTS AND AUTHORITIES …………….…………………  2

     I.      STATEMENT OF FACT ………………...……………….…………………  2

     II.     DISCUSSION …....................…….......………………  6

          **1.**  Summary Judgment Standard ………………………….…………  6

          **2.**  Shipowner's Duty of Care Under The Longshore Act ……...…………...…..  7

          **3.**  A Shipowner's Active Control Duty …………………………...…..  9

          **4.**  Turnover Duty of Safe Condition – Duty to Warn ………………...…  14

          **5.**  Intervention Duty …………………………………………….…  15

     III.    CONCLUSION ........................................………………  16

# <u>TABLE OF AUTHORITY</u>

Cases

*Anderson v. Liberty Lobby, Inc.*,

  477 U.S. 242 (1986)..................................................................................... 7

*Balint v. Carson City*,

  180 F3d 1047 (9th Cir. 1999) ...................................................................... 7

*Bjaranson v. Bothelho Shipping Corporation, Manila*,

  873 F.2d 1204 (9th Cir.1989) .................................................................. 2, 9

*Carpenter v. Universal Star Shipping, S.*A.,

  924 F.2d 1539 (9th Cir. 1991) .................................................................. 15

*Celotex Corp. v. Catrett*,

  477 U.S. 317 (1986)..................................................................................... 7

*Cook v. Exxon Shipping Co.*,

  760 F.2d 750 (9th Cir. 1985) ...................................................................... 2

*Donaghey v. Ocean Drilling & Exploration Co.*,

  974 F.2d 646 (5th Cir.1992) ....................................................................... 7

*Federal Marine Terminals, Inc. v. Burnside Shipping Co.*,

  394 U.S. 404 (1969)................................................................................... 14

*Hedrick v. Daiko Shoji Co.*,

  715 F.2d 1355 (9th Cir. 1983) .................................................................. 10

*Howlett v. Berkdale Shipping, Co. S.A.*,

  512 U.S. 92 (1994)..................................................................................... 14

*Hunter v. Reardon Smith Lines, Ltd.*,

  719 F.2d 1108 (11th Cir. 1983) ................................................................ 15

*Jones v. United States*,

  936 F.3d 318 (5th Cir. 2019) ...................................................................... 7

*Kirsch v. Plovidba,*

    971 F.2d 1026 (3d Cir. 1992) ........................................................................ 10

*Lincoln v. Reksten Mgmt.,*

    354 F.3d 262 (4th Cir. 2003) ........................................................................ 10

*Matsushita Elec. Indus. Co. v. Zenith Radio,*

    475 U.S. 574 (1986) ........................................................................................ 6

*Murray v. S. Route Mar. SA,*

    870 F.3d 915 (9th Cir. 2017) ................................................................. 1, 9, 15

*Reed v. ULS Corp.,*

    178 F.3d 988 (8th Cir. 1999) ........................................................... 1, 2, 10, 11

*Roach v. M/V Aqua Grace,*

    857 F.2d 1575 (11th Cir. 1988) .................................................................... 15

*Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp,*

    350 U.S. 124 (1956) ........................................................................................ 8

*Scindia Steam Navigation Company, Ltd. v. De Los Santos,*

    451 U.S. 156 (1981) ................................................................................ passim

*Seas Shipping Co. v. Sieracki,*

    328 U.S. 85 (1946) .......................................................................................... 8

*Stringfellow v. Bereederungsgesellschaft H. Vogemann GmbH,*

    2011 WL 31097 (2011 D. Or.) ....................................................................... 9

*T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,*

    809 F.2d 626 (9th Cir. 1987) .......................................................................... 7

*United Steelworkers of Am. v. Phelps Dodge Corp,*

    865 F.2d 1539 (9th Cir. 1989) ........................................................................ 6

Statutes

33 U.S.C. § 902(3)(G) ...................................................................................... 13

33 U.S.C. §§ 901-950 ................................................................................................ 1

46 U.S.C. § 30903(b) .............................................................................................. 7

Rules

Fed. R. Civ. P. 56(a) ........................................................................................... 1, 6

## LR-7 CERTIFICATION

Pursuant to this Court's Local Rule 7.1(A), the undersigned counsel for the United States hereby certifies that the parties made a good faith effort by telephonic conference to resolve the dispute and have been unable to do so.

## MOTION

The United States hereby moves the Court for summary judgment on plaintiff's entire Complaint pursuant to Fed. R. Civ. P. 56(a) on the grounds that it is undisputed that the United States did not breach any duty of care it owed plaintiff.

As discussed in detail below, the incident in this case occurred when a weld on the underside of a gangway failed, causing plaintiff's alleged fall and injury.  The case therefore is factually and legally foursquare with *Reed v. ULS Corp.,* 178 F.3d 988 (8th Cir. 1999), cited and relied upon by the Ninth Circuit in *Murray v. S. Route Mar. SA*, 870 F.3d 915, 920 (9th Cir. 2017). Consequently, the United States is entitled to judgment in its favor as a matter of law.

## RELIEF SOUGHT

As set forth in the following memorandum of points and authorities, plaintiff's case against the United States is subject to the provisions of the Longshore and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. §§ 901-950, specifically § 905(b) of the LHWCA. Section 905(b) permits shore-based ship repairmen to file suit against a vessel owner for injuries caused by the negligence of the owner.  However, § 905(b) itself is silent as to the duty of care. The Supreme Court did, however, establish the duty of care in *Scindia Steam Navigation Company, Ltd. v. De Los Santos*, 451 U.S. 156 (1981).  Under *Scindia,* a shipowner has a duty to exercise due care under the circumstances. This duty:

> Extends at least to exercising ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with

reasonable safety to persons and property, and to warning the stevedore of any hazards on the ship or with respect to its equipment that are known to the vessel or should be known to it in the exercise of reasonable care, that would likely be encountered by the stevedore in the course of his cargo operations and that are not known by the stevedore and would not be obvious to or anticipated by him if reasonably competent in the performance of his work.

*Id.* at 167 (emphasis added).[1]

Unlike ordinary negligence cases in which the standard of care is tethered to an amorphous or subjective "reasonable person" standard, *Scindia* and its progeny instead defined five limited duties a shipowner owes to an expert and experienced ship repairmen: (1) turnover duty of safe condition; (2) turnover duty to warn; (3) active involvement duty; (4) active control duty; and (5) intervention duty. *Bjaranson v. Bothelho Shipping Corporation, Manila*, 873 F.2d 1204, 1207 (9th Cir.1989).

This case implicates the active control duty, as the gangway at issue in this case was under the control of the vessel. It is also a hidden defect case. That is, the faults in the welds that failed were hidden and could not have been discovered by the United States upon a reasonable inspection. See, *e.g.*, *Reed v. ULS Corp., supra*, 178 F.3d 988. Therefore, plaintiff cannot establish that the United States breached its active control duty. This is the same even if plaintiff were to argue that the United States breached its turnover duty of safe condition/turnover duty to warn or its intervention duty, all of which impose a duty upon the United States to warn plaintiff of a dangerous condition it knew of, or reasonably should have known of.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    STATEMENT OF FACTS

Plaintiff alleges that in November of 2017 he injured his left hand and shoulder when the gangway he was using to disembark the OSCAR DYSON collapsed, causing him to fall. The

---

[1] The duty of care delineated in *Scindia* as to stevedores applies equally to ship repairmen. *Cook v. Exxon Shipping Co.,* 760 F.2d 750, 752 (9th Cir. 1985), *cert denied* 475 U.S. 1047.

OSCAR DYSON is a pubic vessel owned by the United States, by and through the Department of Commerce, National Oceanic and Atmospheric Administration (NOAA). The gangway was composed of two segments joined together in the middle by a hinge welded to the underside of the gangway.  Upon investigation, NOAA determined that the gangway collapsed due to a faulty weld at the joint.  Specifically, the weld did not penetrate into the metal.  (Declaration of Captain Michael Levine in support of the United States' motion for summary judgement, ¶ 2, hereinafter Levine Declaration.)

The gangway had been in use aboard the vessel since 2013, four years before the incident, without any indication that it was not fit for its intended use.  (Levine Declaration, ¶ 3.)  Moreover, the gangway was visually inspected to ensure it was safe each time it was deployed.  In addition, a crewmember would walk the gangway to ensure that it was safely and securely in place before it was released for general use.  What is more, the vessel maintained all required watches, which included walking the vessel to identify any safety issues onboard the vessel or any safety issue concerning any of the vessel's equipment, including the gangway.  Lastly, the Chief Boatswain (the "Bos'n") of the vessel conducted annual inspections of the vessel's equipment, including the gangway, to identify any needed repairs.  At no time did he detect an issue with the gangway that would render it unsafe to use.   (Declaration of Chief Boatswain Ryan Harris in support of the United States' motion for summary judgment, ¶ 3, hereinafter "Harris Declaration.")

At the time of the incident, the vessel was moored at berth three at NOAA's dock in Newport, Oregon.  The vessel arrived at the dock and tied up on October 24, 2017.  Once moored, the gangway was deployed.  However, per regular ship's practice, the gangway was not to be used until it was visually inspected for safety and walked on by a crewmember to ensure it was safely and securely in place.  The visual inspection took place and, once the inspection and safety walk were completed - once again following ship's practice - a call was made to the bridge confirming

that the gangway was secure and ready to be used.  (Harris Declaration, ¶ 2.)

On November 2, 2017, plaintiff, an employee of Peterson Machinery Company, was working on the OSCAR DYSON's engines.[2]  This was not the first day plaintiff worked aboard the vessel.  He began his work on the vessel several days earlier, as testified to by plaintiff in his deposition:

> Q.    So the incident happened, I believe, on November 2nd, 2017.  Does that sound correct?
> A.    Yes.
> Q.    And you had been working on there a couple of days prior to that?
> A.    Yes.
> Q.    So going back towards the end of October into November?
> A.    Yes.
> Q.    Do you know approximately when you guys started?
> A.    I don't recall.  I'm pretty sure that it was the first week that we had been there.  We usually start projects on a Monday, and I think that the 2nd was a Thursday.
> Q.    These two or three days -- you started working on the vessel at least two to three days prior to the accident?
> A.    Correct.[3]

Plaintiff himself had used the gangway numerous times per day since commencing his work aboard the vessel, and on none of those occasions was there any indication of a safety issue.  Moreover, plaintiff was not the only person to use the gangway.  Throughout the days leading up to the incident, plaintiff witnessed numerous people using the gangway, as he testified to at his deposition:

> Q.    And the period of time we're talking about now, the end of October into November of 2017, was the crew aboard the vessel while you were working?
> A.    Yes.
> Q.    And were the people coming and going from the vessel while you were working?

---

[2]    The LHWCA precludes suit by a plaintiff against his employer and instead provides him with a "no fault" worker's compensation remedy.

[3]    Deposition testimony of Steven Nelson taken on December 28, 2020, 21:17 - 22:10, a true and correct copy of which is attached to the Declaration of Eric Kaufman-Cohen in support of the United States' motion for summary judgment as Exhibit "A", hereinafter Kaufman-Cohen Declaration.)

A.      Yes.
Q.      Were other people using the gangway during that period?
A.      Yes.
Q.      Your work, I assume, was below deck where the engines are.
A.      Correct.
Q.      So typically during this period -- again, I'm talking the end of October to November 2017 -- you'd board her in the morning, and then would you have a lunch break and disembark the vessel during the day? How many times did you board and disembark and embark the vessel on a normal workday while you were working during this time period?
A.      At a minimum we would cross it at least three times a day. If we forgot a tool in our truck or needed some additional supplies, then we would have to cross the gangway and go out to our trucks and then back.
Q.      And then during your workday, would you see other people coming aboard?  Were there other contractors working on board the vessel at this time, if you know?
A.      Yes.

**********

Q.      So during the course of your workday, you would use the gangway three times a day approximately.  Did you see other crew members, other contractors, using the gangway during the workday?
A.      Continuously.[4]

Of significance to the United States' motion is that, during the days leading up to the incident, and the day of the incident, not a single complaint was raised about the safety and condition of the gangway.  As testified to by plaintiff:

Q.      Did you notice any problems with the gangway? Did you feel anything out of the ordinary with the gangway at any point?
A.      No.
Q.      Prior to the accident, did you find anything unusual about the gangway?
A.      No.
Q.      Did you have any safety concerns about the gangway?
A.      No.
Q.      Did anybody, any of your coworkers from Peterson, voice to you any concerns about the gangway?
A.      No.
Q.      Any other crew members express to you any concerns about the gangway?
A.      No.

---

[4]      Deposition testimony of Steven Nelson, 24:15 - 25:18; 26:3-7, a true and correct copy of which is attached to the Kaufman-Cohen Declaration as Exhibit "B".

Q.     Any other workers from other subcontractors indicate to you any problems with the gangway?

A.     No.[5]

To sum up, the crew of the OSCAR DYSON conducted reasonable inspections of the gangway each time it was deployed.  Additionally, the vessel maintained all required watches, which included walking the vessel to identify any safety issues onboard the vessel or any safety issue concerning any appurtenance, including the gangway.  On top of that, the Bos'n conducted annual inspections of the ship's gear, including the gangway, and found no fault with the gangway year after year. What this establishes is that the faulty welds on the joint on the underside of the gangway were a hidden defect, which could not have been discovered upon a reasonable inspection.  A reasonable inspection was all that the United States owed plaintiff under section 905(b) of the LHWCA.

## II.     DISCUSSION

### 1.     Summary Judgment Standard

A court shall grant summary judgment on a claim when the moving party establishes that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  No genuine issue of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986).  A "scintilla of evidence" or evidence that is merely "colorable or not significantly probative" does not present a genuine issue of material fact. *United Steelworkers of Am. v. Phelps Dodge Corp*, 865 F.2d 1539, 1542 (9th Cir. 1989), *cert denied,* 493 U.S. 809 (1989) (citation omitted).  A genuine issue of fact exists only "if the evidence is such that

---

[5]     Deposition testimony of Steven Nelson, 26:8 – 27:1, a true and correct copy of which is attached to the Kaufman-Cohen Declaration as Exhibit "C".

a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In cases that are tried to a jury, the court must not weigh the evidence or determine the truth of the matter, but only determine whether there is a genuine issue for trial. *Balint v. Carson City*, 180 F3d 1047, 1054 (9th Cir. 1999) (citation omitted). However, pursuant to the Suits in Admiralty Act, 46 U.S.C. § 30903(b), an admiralty action against the United States must be tried to the court, sitting without a jury. In a non-jury case, "a district court has somewhat greater discretion to consider what weight it will accord the evidence." *Jones v. United States*, 936 F.3d 318, 321–22 (5th Cir. 2019). As such, "[w]hen deciding a motion for summary judgment prior to a bench trial, the district court has the limited discretion to decide that the same evidence, presented to him or her as a trier of fact in a plenary trial, could not possibly lead to a different result." *Id.*

Summary judgment is also proper if the party opposing the motion fails to establish an essential element of his or her case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In this regard, the non-moving party must do more than simply deny the allegations raised by the moving party. *Donaghey v. Ocean Drilling & Exploration Co*., 974 F.2d 646, 649 (5th Cir.1992). Rather, the non-moving party must come forward with competent evidence, such as affidavits or depositions, to buttress its claims. *Id*. The substantive law governing a claim determines whether a fact is material. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n* , 809 F.2d 626, 631 (9th Cir. 1987). In this case, the substantive law-governing plaintiff's Complaint is that set forth in § 905(b) of the LHWCA.

## 2. Shipowner's Duty of Care Under The Longshore Act

In analyzing the United States' duty of care owed to ship repairmen working aboard its vessels we must start with the 1972 amendments to the LHWCA. Prior to the 1972 amendments,

a ship repairman injured while working aboard a vessel could receive compensation payments from his/her employer and also bring an action against the vessel owner for negligence and "unseaworthiness." *Seas Shipping Co. v. Sieracki*, 328 U.S. 85 (1946). A claim for unseaworthiness required no proof of fault on the part of the shipowner other than an unsafe condition of the vessel that led to an injury. However, if the unseaworthy condition was created by the ship repairman's employer, the vessel owner could recover over against the employer for breach of express or implied warranty of workmanlike performance. *Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp,* 350 U.S. 124 (1956). This arrangement was entirely changed by the 1972 amendments to LHWCA, as noted in *Scindia*, *supra*:

> The 1972 Amendments, particularly by adding § 905(b), radically changed this scheme of things. The compensation payments due the longshoreman from the stevedore for injuries incurred in the course of his employment were substantially increased; the longshoreman's right to recover for unseaworthiness was abolished; his right to recover from the shipowner for negligence was preserved in § 905(b), which provided a statutory negligence action against the ship; and the stevedore's obligation to indemnify the shipowner if the latter was held liable to the longshoreman was abolished. (*Scindia*, 451 U.S at 165).

After discussing the ramifications of the 1972 amendments to the LHWCA on a shipowner's duty of care, the *Scindia* Court set forth its seminal holding:

> We are of the view that absent contract provision, positive law, or custom to the contrary - none of which has been cited to us in this case - the shipowner has no general duty by way of supervision or inspection to exercise reasonable care to discover dangerous conditions that develop within the confines of the cargo operations that are assigned to the stevedore. The necessary consequence is that the shipowner is not liable to the longshoremen for injuries caused by dangers *unknown to the owner and about which he had no duty to inform himself*. This conclusion is plainly consistent with the congressional intent to foreclose the faultless liability of the shipowner based on a theory of unseaworthiness or nondelegable duty. (*Id.* at 171, emphases added.)

With this discussion of the impact the 1972 amendments had on a shipowner's duty of care, we turn to the duties a vessel owner owes to a ship repairman. *Scindia* and its progeny delineated five limited duties a shipowner owes to ship repairmen: (1) turnover duty of safe condition; (2)

turnover duty to warn; (3) active involvement duty; (4) active control duty; and (5) intervention duty. *Bjaranson,* 873 F.2d at 1207. The only duty of care the United States owed to plaintiff was the active control duty, which, as established below, it did not breach.  However, as discussed below, even if the Court were to apply a shipowner's turnover duty of safe condition/duty to warn and/or the intervention duty, it is undisputed that the United States did not breach these duties as well.

### 3.    A Shipowner's Active Control Duty

Under the active control duty, a vessel owner must warn a ship repairman of any hazards on the ship or its equipment that are known to the vessel, or should have be known to it, in the exercise of reasonable care.  *Scindia, supra,* 451 U.S. at 167.  Thus, "the shipowner has a duty with respect to the condition of the ship's gear, equipment, tools, and work space to be used in the [repair] operations; and if he fails at least to warn the [ship repairman] of hidden danger which would have been known to him in the exercise of reasonable care, he has breached his duty and is liable if his negligence causes injury to a [ship repairman]."  *Id. See also, Stringfellow v. Bereederungsgesellschaft H. Vogemann GmbH,* 2011 WL 31097, at *5 (2011 D. Or.) (The active control duty "is the *Scindia* duty that obtains in the event the vessel fails to exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operation.")

The United States does not disagree that the active control duty encompasses a "reasonable" duty of inspection.  That is, a shipowner has a duty to conduct a reasonable inspection of its vessel and equipment to discover any hidden defect that may cause injury to a ship repairman. *Murray v. S. Route Mar. SA*, 870 F.3d 915, 920 (9th Cir. 2017) (italics regarding citation to *Reed* added):

Our court has been even clearer on a vessel owner's duty to perform an inspection to fulfill its turnover duty. We have unequivocally held that '[w]here the shipowner itself supplies equipment, it has a duty to inspect the equipment before turning it over for use by the stevedore.' *Hedrick v. Daiko Shoji Co.*, 715 F.2d 1355, 1357 (9th Cir. 1983); *see also Lincoln v. Reksten Mgmt.*, 354 F.3d 262, 268 (4th Cir. 2003) ('[T]he vessel might have been negligent in the maintenance, upkeep, and *especially the inspection of the deck* in question, so that, in the exercise of reasonable care, it might have discovered the defect ..., enabling it to warn the stevedore of the defect.' (emphasis added)); *Reed v. ULS Corp., 178 F.3d 988, 992 (8th Cir. 1999) (affirming summary judgment for vessel owner because '[t]he record reflects that the inspection of the gangway ... was reasonable'); Kirsch*, 971 F.2d at 1029 (noting 'the shipowner's duty to inspect the ship for hazards before turning the ship over to the stevedore').[6]

The Ninth Circuit's citation to *Reed v. ULS Corp.,* 178 F.3d 988, 992 (8th Cir. 1999), in its decision in *Murray* is significant in determining whether the United States breached its active control duty in this case.  The facts of *Reed* are strikingly similar to the facts of this case, and warrant repeating verbatim here:

The record reveals that the vessel in question was equipped with a gangway on each side of the vessel. The gangways were stowed vertically off the side of the vessel's deck when not in use. On the day in question the vessel docked at approximately 4:00 a.m. and the gangway in question was swung into place to allow passage to and from the dock. When the gangway was put in place, *it was inspected visually from the vessel and walked on to determine if there was anything unusual*. No problems were observed. At 8:00 a.m., on the day in question, appellant, Mr. Reed, and five other longshoremen boarded the vessel via the gangway; they encountered no problems with the gangway. Loading of the vessel began at approximately 9:00 a.m., and the gangway *continued to be used by vessel crew members and others*. At approximately 12:50 p.m., Mr. Reed fell while using the gangway when the eighth step from the bottom failed. A subsequent inspection revealed that the two pins which hold the step in a horizontal position when the gangway is in use were missing. Only if both pins are missing will a step fail by moving from a horizontal to a vertical position when the gangway is extended to the dock for use.  (*Reed, supra,* 178 F.3d at 990, emphasis added.)

---

[6]  Although *Murray* dealt specifically with a shipowner's turnover duty of care, the United States is confident that the court would apply the same reasonable duty to inspect standard to a shipowner's active control duty.

After a recitation of the underlying facts of the case, the court in *Reed* proceeded to examine the duties of care a shipowner owes to longshoremen under *Scindia* and its progeny. After doing so, the court went on to affirm the lower court's grant of summary judgment in favor of the vessel owner. In so doing, the court found:

> Thus, in accordance with the holding of *Scindia*, plaintiff must show in the case at bar that in the exercise of reasonable care that ULS knew or should have known of the defective condition of the gangway step that failed. In this regard, Reed argues that ULS had an obligation in the exercise of reasonable care to inspect the underside of the gangway and that if ULS had done so it would have been able to detect a defective condition in the step. *The record reflects that the inspection of the gangway by ULS was reasonable under the circumstances here and that even if ULS had inspected the underside of the gangway it would not necessarily have determined that a defect existed.*
>
> ULS conducts a monthly inspection of the vessel in question including the gangway. The monthly gangway inspection is conducted while the vessel is underway and does not entail observation of the underside of the gangway. The underside of the gangway was not inspected prior to Reed's accident. When the gangway is not in use, it is stowed vertically on its side in a cradle located on the edge of the deck of the vessel. In this position, the underside with the mechanical linkage faces away from the deck. However, both when the gangway is stowed and when it is in use, at least some of the pins can be visually observed. When the gangway is stowed, a person can lean out from the deck to conduct at least a partial inspection and when the gangway is in use, the underside of the gangway can be viewed from the dock. *Nonetheless, even if all of the pins and wires could be visually observed from either the deck of the vessel or the dock, there would be no way to determine the structural integrity of the pins or wires by such an inspection.* In addition to the monthly inspection, the gangway at issue was inspected when it was placed in use by vessel's crew visually observing the gangway from the topside by looking down from the vessel's deck to determine that everything seen was in order. Additionally, a crew member walked the gangway when it was lowered to the dock to determine there were no problems. There is nothing to indicate that such an inspection constitutes a failure to exercise reasonable care under the circumstances of this case. (*Id.* at F.3d 992.)

It must be stressed that the gangway at issue in *Reed* failed because two pins on its underside were *actually missing* -- a condition that could arguably have been discovered upon a closer inspection, an inspection the court did not deem necessary in order to find that the shipowner fulfilled its active control duty. In this case, and as explained immediately below, the defects

were internal to the welds, a condition that could not be detected even if the welds were visually

inspected.

In this case, the welds broke due to lack of fusion and/or lack of penetration of the fillet

weld joining two sections of the gangway.[7]  (See Declaration of Rita Kirchhofer, Ph.D. in support

of the United States' motion for summary judgment, ¶ 2, hereinafter "Kirchhofer Declaration.")

In fillet welds, such as the subject welds here, lack of fusion and/or lack of penetration defects are

not detectable by visual methods, since the "weld cap" covers and literally hides the "root" area of

the weld (*i.e.* internal weld defect).  The weld cap is fused to the underlying fillet weld.  Therefore,

in order to visually inspect the underlying weld, one would have to crack open the weld cap.

Furthermore, in most cases, lack of fusion and/or lack of penetration defects cannot be not be

detected by non-destructive visual means.  This is because the weld integrity may appear intact

until, as in this case, a sudden failure of the weld occurs.  (Kirchhofer Declaration, ¶ 2.)

In order to identify the lack of fusion and/or lack of penetration defect in the subject welds,

NOAA would have had to undertake one of the following in-depth analyses and testing: (1) Phase

Array Ultrasonic Testing, which entails the use of an ultrasonic probe to scan the internal

configuration of the weld to detect a lack of fusion and/or penetration in a weld; or (2)

Radiographic Testing (RT).  This testing uses a high-power x-ray or gamma ray source to probe

the internal configuration of the weld. Porosity, the lack of fusion and/or penetration, can be found

with RT, but only large volumetric defects can be detected in complex welds (such as T-joints).

RT is expensive and typically only used for critical equipment such as pressure vessels and in

---

[7]  Fillet welding refers to the process of joining two pieces of metal together when they are perpendicular or at an angle. These welds are commonly referred to as tee joints, which are two pieces of metal perpendicular to each other, or lap joints, which are two pieces of metal that overlap and are welded at the edges

nuclear applications.  (Kirchhofer Declaration, ¶ 4.)  Under the facts and circumstances of this case, it would be entirely unreasonable and impractical to have expected or required NOAA to perform one or the other of these two methods to discover the defect in the subject welds.

Plaintiff may argue that NOAA could have performed a load test of the gangway.[8] However, there are no statutes or regulations that required NOAA to conduct a load test of the subject gangway.  Moreover, there are no statutes or regulations that required NOAA to undertake an in-depth inspection of the gangway or test the individual welds on the gangway.  (Declaration of James Dolan in support of the United States' motion for summary judgment, ¶ 3, hereinafter "Dolan Declaration.")

Not only are there no applicable statutes or regulations that would have required NOAA to load test the gangway or conduct an in-depth inspection of the gangway, there is no custom or practice within the maritime industry that would have required NOAA to do so.  Instead, custom and practice within the maritime industry, as exemplified in *Reed*, merely entailed visual inspection of the gangway each time it was deployed, and having a crewmember walk the gangway to ensure that it was in a safe condition and securely in place.  (Dolan Declaration, ¶ 4.)  As described above, the crew of the OSCAR DYSON followed this custom and practice to the letter and, in addition, conducted a yearly inspection that still did not, and would not have, discovered the defective weld that was covered by the weld cap.

We note here the critical importance of the 1972 amendments to the LHWCA with respect to the abolishment of the "unseaworthiness" doctrine to LHWCA cases.[9]  Under the "liability

---

[8]    When a gangway is load tested, it is placed in a horizontal orientation fixed on both ends and then a uniform weight is applied, using either water bags, sandbags, or a hanging weight.  The amount of weight to be applied is determined by the weight-bearing limit the gangway is calibrated for.

[9]    The unseaworthiness doctrine is still applicable to crew of vessels (*i.e.*, "seamen") working aboard vessels in navigation. However, crew of vessels are expressly excluded from the scope of coverage under the LHWCA. *See*, LHWCA, 33  U.S.C. § 902(3)(G).

without fault" standard of the unseaworthiness doctrine, a plaintiff would be able to argue that the "reasonableness" of conducting destructive and/or complex testing (*e.g.*, "Phase Array Ultrasonic Testing") is irrelevant.  That option, however, was unambiguously and irrevocably withdrawn as a result of the tradeoffs codified in the 1972 amendments, whereby (a) the injured worker was provided with significantly increased benefits under his "no fault" worker's compensation remedy, and (b) the worker's employer was provided immunity from suit/indemnity/cross-claim by the shipowner.  As part of that legislative compromise, the shipowner was rendered immune from claims based upon unseaworthiness.  *Scindia, supra,* 451 U.S. at 165, "the 1972 Amendments, particularly by adding § 905(b), radically changed this scheme of things. The compensation payments due the longshoreman from the stevedore for injuries incurred in the course of his employment were substantially increased; the longshoreman's right to recover for unseaworthiness was abolished…."

### 4.   Turnover Duty of Safe Condition – Duty to Warn

The foregoing discussion and legal standard also apply to the turnover duties.  A shipowner must exercise ordinary care under the circumstances to turn one's ship and its equipment over to an expert and experienced ship repairman "such that the repairman will be able to carry out repair operations with reasonable safety to persons and property."  *Federal Marine Terminals, Inc. v. Burnside Shipping Co.,* 394 U.S. 404, 416-417 (1969).  A corollary to a shipowner's turnover duty of safe condition is the turnover duty to warn of hazardous conditions on the ship that are known or should have been known to it, but are not obvious to the ship repair contractor or its personnel. *Howlett v. Berkdale Shipping, Co. S.A.* 512 U.S. 92, 98-99 (1994).

As noted earlier, the Ninth Circuit has grafted a duty of reasonable inspection onto a shipowner's turnover duties:

> This formulation of the turnover duty produces doctrinal coherence because it logically fits the duty to inspect within the general turnover duty and its corollary duty to warn. The turnover duty mandates exercising reasonable care to provide a

ship and equipment that are reasonably safe for the stevedore to carry on cargo operations. Part of that duty is to examine the ship and equipment. When that inspection turns up latent hazards that would not be obvious to or anticipated by a competent stevedore, the vessel owner's duty to warn kicks in because the vessel owner is in the best position to detect and avoid harm and should be liable if it does not speak up. . . .

Recognizing a duty to inspect as part of the turnover duty does not expand shipowner liability. *The inspection is constrained by what is reasonable under the circumstances*, and the ultimate measure of whether the vessel owner has satisfied its turnover duty is whether the vessel owner has provided a reasonably safe environment.  (*Murray, supra* 870 F.3d at 920–21, citations omitted, emphasis added.)

Under the facts and circumstances of this case, the United States has established that it conducted reasonable inspections of the gangway each time it was deployed over all the years it was in use aboard the OSCAR DYSON.  What is more, these inspections conformed to the custom and practice of the maritime industry.  The defects in the welds that failed on the underside of the gangway were latent defects that could not have been discovered by NOAA upon a reasonable inspection.  Consequently, plaintiff cannot establish that the United States breached any arguable turnover duty it may have owed plaintiff.

**5.    Intervention Duty**

The Supreme Court in *Scindia* "trod cautiously in imposing liability for failure to intervene on the shipowner."  *Carpenter v. Universal Star Shipping, S.*A., 924 F.2d 1539, 1543 (9th Cir. 1991).  Hence, a shipowner's duty to intervene is narrow. *Roach v. M/V Aqua Grace*, 857 F.2d 1575, 1581 (11th Cir. 1988); *see also Hunter v. Reardon Smith Lines, Ltd*., 719 F.2d 1108, 1112 (11th Cir. 1983) (describing the duty to intervene as a "very limited duty").  A shipowner must intervene only when it becomes actually aware that the ship's equipment poses a danger to a ship repairman and is aware that the ship repair contractor is acting unreasonably to protect its worker. *Roach, supra.*

Here, it is undisputed that the crew of the OSCAR DYSON did not have actual knowledge that the gangway posed a danger to plaintiff, or any other personnel using the gangway - including the crewmembers themselves.   As a result, plaintiff cannot establish that the United States breached its duty to intervene.

### III.   <u>CONCUSION</u>

The United States owed plaintiff a duty of reasonable care under the circumstances to ensure that the gangway of the OSCAR DYSON was fit for its intended purpose.   This duty of care required the United States to conduct a reasonable inspection of the gangway prior to its use. The United States submits that it did so.   Following the custom and practice of the maritime industry, the gangway was visually inspected each time it was deployed to ensure it was in a safe condition.   What is more, a crewmember walked the gangway to confirm that it was in a safe condition and securely in place before use.   There is no custom, practice, or any statute or regulation, requiring the United States to do more.

To conclude, the defects in the welds on the underside of the gangway were hidden, and could not be detected upon a reasonable inspection.   In order to have discovered the defects in the welds on the underside of the gangway, the United States would have had to conduct one of two available tests.   One requiring the use of ultrasonic probes, the other requiring radiographic testing using a high-power x-ray or gamma ray source to probe the internal configuration of the weld.   To have require the United States to undertaken one or the other of these two in-depth and costly test on a gangway that had no apparent defect would be unreasonable.

It is undisputed that the United States did not breach any of the duties of care it owed plaintiff under § 905(b) of the Longshore and Harbor Workers Compensation Act.   Consequently, the United States is entitled to judgment in its favor as a matter of law on plaintiff's entire Complaint.

Dated: March 1, 2021

RENATA GOWIE
Assistant United States Attorney
Chief, Civil Division

BRIAN M. BOYNTON
Acting Assistant Attorney General
R. MICHAEL UNDERHILL
Attorney in Charge, West Coast Office
Torts Branch, Civil Division

s/ Eric Kaufman-Cohen
ERIC KAUFMAN-COHEN
Assistant Attorney in Charge
West Coast Office
Torts Branch, Civil Division
U.S. Department of Justice

Attorneys for Defendant
United States of America

CERTIFICATE OF SERVICE

I hereby certify that, on March 1, 2021, a true and correct copy of the foregoing THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION was served electronically through CM/ECF on:

Charles Robinowitz
Law Offices of Charles Robinowitz

Attorneys for Plaintiff
Steven M. Nelson

/s/Eric Kaufman-Cohen
ERIC KAUFMAN-COHEN