IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

STEVEN M. NELSON,

        Plaintiff,

   v.

UNITED STATES OF AMERICA
by and through the National Oceanic and
Atmospheric Administration,

        Defendant.

No. 3:19-cv-01761-HZ

FINDINGS OF FACT & CONCLUSIONS OF LAW

Charles Robinowitz
Mary Elizabeth Duncan
1211 SW Fifth Avenue
2323 Pacwest Center
Portland, OR 97204

    Attorneys for Plaintiff

Eric Kaufman-Cohen
U.S. Department of Justice
450 Golden Gate Avenue, Room 7-5395
P.O. Box 36028
San Francisco, CA 94102

    Attorney for Defendant

1 – FINDINGS OF FACT & CONCLUSIONS OF LAW

HERNÁNDEZ, District Judge:

Plaintiff brings this negligence action against the United States of America, by and through the National Oceanic and Atmospheric Administration (NOAA). The Court conducted a four-day bench trial on Plaintiff's negligence claim on January 11–14, 2022. The following are the Court's Findings of Fact and Conclusions of Law. *See* Fed. R. Civ. P. 52(a). As explained below, the Court finds in favor of Defendant on Plaintiff's claim.

## FINDINGS OF FACT

A finding of negligence implies the defendant could have taken reasonable steps to prevent the accident. This was an unpredictable catastrophic event that resulted in serious consequences for Plaintiff. The Court listened to a full day of testimony on Plaintiff's damages. The Court acknowledges this harm and regrets that Plaintiff suffered these life-altering injuries.

The OSCAR DYSON is a public vessel owned by the United States, by and through the Department of Commerce, NOAA. On November 2, 2017, Plaintiff worked aboard the OSCAR DYSON as a marine diesel technician helping to overhaul two diesel engines. Plaintiff was employed by Peterson Machinery, a subcontractor for NOAA. At the time, the vessel was docked in Newport, Oregon.

As Plaintiff disembarked the vessel after his shift, the gangway broke and crashed on the concrete dock. He was holding the handrail when the accident occurred and injured his shoulder. Plaintiff sustained significant injuries that have impacted his work and family life.

**I.     Visibility of Defect**

A central question in this case is whether the defect that caused the gangway to collapse was visible before the accident. The subject gangway was made of aluminum and composed of two sections connected in the middle by a hinge plate. Ex. 19, 20. At the time of the accident,

Plaintiff was in the middle of the gangway and thereby close to or directly above the hinge plate. Plaintiff's welding expert, Daniel Van Domelen and Defendant's welding and metallurgy expert, Dr. Rita Kirchhofer, Ph.D. testified that the gangway collapsed because of a lack of penetration and/or lack of fusion of the fillet weld joining the hinge plate to the upper section of the gangway.

The experts disagreed as to the likelihood that the defect in the weld would have been detectable through a visible inspection prior to the accident. Dr. Kirchhofer testified that in fillet welds, lack of fusion and/or lack of penetration defects are not typically detectable by visual methods because the weld cap hides the root area of the weld (i.e. internal weld defect). She testified that this is because typically a fatigue crack initiates at the root of the weld where the lack of penetration occurred and then propagates out. According to Dr. Kirchhofer, in this scenario, the weld would not fail until the crack reaches the surface of the weld. So in the case of the collapsed gangway, it was her opinion that it was more likely than not that a visual inspection would not have shown external indications of a weld crack before the gangway's failure.

Mr. Van Domlen testified that lack of fusion defects in fillet welds can be detected through visual means. In the case of the gangway that collapsed, he testified that he believed the problem began with a discontinuity inside the weld. He stated that through normal operational use, stresses likely moved through the discontinuity resulting in small fractures that grew to the surface of the weld. He testified that the fact that the gangway broke under a relatively light load, and the fact that two welds broke, make it highly probable that small fractures (also referred to as cracks) would have been visible prior to the accident.

3 – FINDINGS OF FACT & CONCLUSIONS OF LAW

The Court finds the testimony of Dr. Kirchhofer and Mr. Van Domlen equally credible and persuasive. The experts agreed on the source of the defect but disagreed as to the likelihood that it would have been visible prior to the accident. In light of the competing expert testimony, the Court finds that Plaintiff has not carried his burden of proving that a defect in the weld on the hinge plate on the underside of the gangway could have been discovered upon a visual inspection.

## II.     Reasonable Inspection

Defendant's expert, Charles Fluke, a NOAA Fleet Inspector with NOAA's Safety and Environmental Compliance Division, Office of Marine and Aviation Operation, testified that at the time of the incident, NOAA had in place a fleet wide "Gangway Handling" directive. Ex. 501. This directive provides in pertinent part:

> Before rigging and after stowing the gangway, check it for fatigue, corrosion, cracked welds, and loose bolts. Check the tread surface for wear of the non-skid or damage that could cause a tripping or slipping hazard.

*Id.* ¶ 3.4. The NOAA fleet wide gangway handling directive also states, "[t]he Commanding Officer (CO) must ensure gangway handling operations are conducted per this procedure." *Id.* ¶ 3.1. The directive further provides "[t]he CO must develop Ship's Specific Instructions for this procedure." *Id.* ¶ 3.2.

Captain Levine, the Commanding Officer ("CO") of the OSCAR DYSON, testified that as the CO of the OSCAR DYSON he developed Ship Specific Instructions for the OSCAR DYSON that conformed to NOAA's fleet wide Gangway Handling directive. Ex. 506

CO Levine's Ship Specific Instructions for the DYSON provides in pertinent part:

¶ 3.1   The CO must develop Ship's Specific Instructions for this procedure. The Chief   Boatswain (CB) and deck department are responsible for the safe execution of handling, rigging, and maintaining the gangway both inport and at sea.

4 – FINDINGS OF FACT & CONCLUSIONS OF LAW

\* \* \* \*

¶ 3.4   Before rigging and after stowing the gangway, the CB or designee checks it for fatigue, corrosion, cracked welds, and loose bolts. Check the tread surface for wear of the non-skid or damage that could cause a tripping or slipping hazard.

\* \* \* \*

¶ 3.11  Verify there are no obstructions, trash, oil, or tripping hazards on the gangway.  OOD [Officer of the Deck] and security watch are responsible for regularly checking the position of the gangway throughout the day and night.

*Id.* CO Levine testified that pursuant to his ship specific instructions for gangway handling, Chief Boatswain ("Bosun") Ryan Harris was charged with ensuring the safe execution of handling, rigging, and maintaining the gangway both while the OSCAR DYSON was in port and at sea.  When Chief Harris was not aboard the ship, his designee, Lead Fishman and acting Bosun Bruce Mokiao, was charged with maintaining the gangway. As Chief Harris' designee and acting Chief Bosun, Mr. Mokiao was charged with following CO Levine's ship specific instructions for the handling of the ship's gangways.

Before its use in Newport, Oregon, the gangway that collapsed had been stored at a NOAA warehouse in Kodiak, Alaska. Chief Harris testified that before the gangway was loaded onto the OSCAR DYSON for use in Newport, he conducted an inspection of the gangway in the warehouse. Mr. Mokiao assisted Chief Harris in his inspection. Mr. Mokiao operated a forklift which was used to lift the gangway so Chief Harris could inspect the hinge plate on its underside. Chief Harris testified that his inspection did not reveal any visible cracks in the welds on the gangway, including the welds around the hinge plate.

Chief Harris was not with the ship when it sailed from Kodiak to Newport, Oregon. Consequently, pursuant to Captain Levine's ship specific gangway handling instruction, Mr. Mokiao became his designee and acting Chief Bosun.

Mr. Mokiao testified that when the ship arrived in Newport, Oregon in October of 2017, he visually inspected the gangway before it was deployed. His inspection included an examination of the underside of the gangway, including the welds on the hinge plate. Mr. Mokiao further testified that he did not see any visible crack on any weld on the hinge plate on the underside of the gangway.

After Mr. Mokiao conducted his initial inspection of the gangway, the gangway was deployed and secured to the pier. However, before it was deemed safe to use, a crewmember walked the gangway to ensure that it was safe and secure. Once it was confirmed that the gangway was safe and secure, a call was made to the bridge confirming that the gangway was safe, secure and ready to be used.

Once the gangway was deemed safe to use, Mr. Mokiao visually inspected the gangway, including the underside, twice a day daily every day up until and including the day of the accident.

Defendant's expert James Dolan, who has over 50 years of experience in the marine industry, including five years sailing as a licensed Chief Engineer on various commercial ships, as well as over 25 years with the American Bureau of Shipping (ABS)[1], testified that the inspections of the gangway by Chief Harris and Mr. Mokiao met and possibly exceeded the custom and practice of the maritime industry.

---

[1] The American Bureau of Shipping is an American maritime classification society that promotes the safety of life, property and the environment, through the development and verification of standards for the design, construction and operational maintenance of ocean-going vessels.

The Court finds that Mr. Mokiao's inspection of the gangway prior to its deployment in Newport, his twice daily inspections, and Chief Harris's inspection in the Kodiac warehouse conformed to the ship specific instructions for gangway handling aboard the OSCAR DYSON and NOAA's Gangway Handling directive. It finds further that based on these actions, Defendant undertook a reasonable inspection of the gangway before its collapse on November 2, 2017.

### III.  Maintenance of Records

Prior to its use aboard the OSCAR DYSON, the gangway was used aboard the NOAA ship MILLER FREEMAN. The FREEMAN was decommissioned in 2013. Beyond this information, Defendant presented no evidence of the gangway's prior maintenance or history and no documentary evidence of previous inspections of the gangway. Defendant also offered no evidence of the gangway's dimensions, age, weight, or load capacity.

Plaintiff's expert, Captain Derie, testified maritime industry custom and practice calls for a ship owner to keep detailed records of inspections of gangways and requires all gangways to have a plate attached to them identifying the load capacity of the gangway. Mr. Dolan, on the other hand, testified that this is not the custom and practice, and that although a ship owner must maintain hundreds of pages of documents and files pertaining to the operation of a ship, he never once, in all his years with ABS, reviewed a "gangway" file aboard a ship during an inspection. Mr. Fluke testified as well that during his time serving as a ship inspector for the Coast Guard, he never reviewed a gangway file aboard a ship during one of his inspections.

Based on the credible testimony of Mr. Dolan and Mr. Fluke, the Court finds that there is no custom and practice in the marine industry requiring a ship owner to keep detailed records of inspections of gangways.

## IV. Load Testing

Defendant presented no evidence that the subject gangway was load tested prior to its use aboard the OSCAR DYSON. Plaintiff's expert Captain Derie testified that it is the custom and practice of the maritime industry is to load test a gangway every five years. He based his testimony in part on the guidance for gangways within the Safety of Life at Sea Convention (SOLAS)[2]. The guidance states that "[a]t every five-yearly survey . . . the gangway should be operationally tested with the specific maximum operational load of the gangway." Ex. 27 at 5.

Captain Derie, CO Levine, Mr. Dolan and Mr. Fluke agreed that SOLAS does not apply to the OSCAR DYSON because the ship does not routinely make international voyages. However, they also testified that even if a specific regulation or international convention does not apply, it is good custom and practice for a ship owner to use those regulations and conventions as guidelines.

Mr. Dolan testified that despite the guidance in SOLAS, it is not the custom and practice in the shipping industry to load test a gangway every five years and he could not remember a time when a ship owner load tested a gangway. Mr. Dolan also testified that the ABS does not require ship owners to load test gangways every five years.

Mr. Fluke testified that NOAA does not load test its gangways. He further testified that before joining NOAA he served in the United States Coast Guard for 32 years, the majority of that time he served as a vessel inspector tasked with inspecting commercial vessel to ensure that they complied with all applicable domestic and international codes and regulations. At no time did the Coast Guard require a ship owner to load test a gangway. He further testified that at no time during his 32-year career with the Coast Guard did the Coast Guard load test its own

---

[2] Safety of Life at Sea Convention (SOLAS) is an international maritime treaty that establishes an umbrella of minimum safety requirements for ships that travel in international waters.

gangways used aboard its own ships.

The SOLAS guidance on gangways suggests that five-yearly load tests are a best practice in the maritime industry. However, the OSCAR-DYSON was not subject to SOLAS, and as the Court found above, Defendant complied with its own gangway handling directives. The testimony of Mr. Dolan and Mr. Fluke demonstrates that these directives reflect the custom and practice for maintaining gangways on government owned vessels that travel in domestic waters. While relevant, the existence of international guidance that the OSCAR DYSON was not subject to and was not widely followed by its sister ships, does not create a duty. The Court finds Defendant did not breach the relevant standard of care by failing to load test the subject gangway every five years.

## CONCLUSIONS OF LAW

Plaintiff's claim alleges facts that constitute an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. With respect to subject matter jurisdiction over Defendant, the United States has waived its sovereign immunity from suit and consented to be sued pursuant to the Public Vessels Act, 46. U.S.C. §§ 31101, *et seq.* ("PVA"), which incorporates provisions of the Suits in Admiralty Act ("SIAA"), 46 U.S.C. §30901, *et seq*.

Under the PVA, an injured party has no greater claim against the United States than one would have against a private person under similar circumstances. *Canadian Aviator, Ltd. v. United States*, 324 U.S. 215, 227–228 (1945).

As a shore-based ship repairman, § 905(b) of the Longshore and Harbor Workers' Compensation Act (LHWCA) governs Plaintiff's claim. 33 U.S.C. §§ 905(b). In *Scindia Steam Navigation Co. v. De Los Santos*, the Supreme Court defined three duties a vessel owner owes to ship repairmen. 451 U.S. 156, 167, 175–76 (1981)). The active control duty applies here.

9 – FINDINGS OF FACT & CONCLUSIONS OF LAW

The active control duty "provides that a shipowner must exercise reasonable care to prevent injuries to longshoremen in areas that remain under the 'active control of the vessel.'" *Howlett v. Birkdale Shipping Co.*, S.A., 512 U.S. 92, 98 (1994) (citation omitted); *Christensen*, 279 F.3d at 812 ("The active control duty requires the vessel owner to act reasonably if it actively participates in the cargo operations, and to avoid exposing the stevedores to harm from hazards they may encounter in areas, or from equipment, under the active control of the ship."). Thus, this duty encompasses a duty of reasonable inspection of the ship and its equipment. *See Scindia Steam Navigation Co.*, 451 U.S. at 167 ("the shipowner has a duty with respect to the condition of the ship's gear, equipment, tools, and work space to be used in the [repair] operations; and if he fails at least to warn the [ship repairman] of hidden danger which would have been known to him in the exercise of reasonable care, he has breached his duty and is liable if his negligence causes injury to a [ship repairman].").

The Court finds Defendant did not breach the standard of care for a government owned vessel i.e., its active control duty under section 905(b) of the Long Shore and Harbor Workers Compensation Act. Defendant fulfilled its duty to conduct a reasonable inspection of the gangway before it collapsed and had no duty to load test the gangway once it was in use. Regardless, the Court finds that it is more likely than not that any defects in the welds on the hinge plate were hidden and could not have been discovered upon a reasonable inspection of the gangway. Accordingly, the Court finds for Defendant on Plaintiff's negligence claim.

//
//
//
//

10 – FINDINGS OF FACT & CONCLUSIONS OF LAW

## CONCLUSION

The Court finds for Defendant on Plaintiff's negligence claim. Judgment shall be entered in favor of Defendant. The parties shall submit a joint proposed form of judgment within fourteen days of these Findings of Fact & Conclusions of Law.

IT IS SO ORDERED.


DATED: January 31, 2022.



_____
MARCO A. HERNÁNDEZ
United States District Judge